UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.

MALAGA TOWERS CONDOMINIUM
ASSOCIATION, INC.

    Plaintiff,

v.

QBE INSURANCE CORPORATION,

    Defendant.

_____/

**COMPLAINT**

Malaga Towers Condominium Association, Inc. ("Malaga Towers") hereby complains and demands judgment against QBE Insurance Corporation ("QBE"), and states:

**JURISDICTION AND VENUE**

1. Malaga Towers is a Florida corporation with its principal address in Hallandale Beach, Florida.

2. QBE is a Pennsylvania corporation with its principal place of business in New York.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

{00247912;v1}

4. This Court has personal jurisdiction over QBE because QBE issued to Malaga Towers an insurance policy that insures real property located in Florida, and said insurance policy and real property are the subject of this lawsuit.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the property that is the subject of the action is located in this judicial district and a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district.

## FACTUAL ALLEGATIONS

6. Malaga Towers Condominium Association, located at 1920 South Ocean Drive in Hallandale, Florida, is comprised of two 2-story towers with 146 units consisting of 1, 2, and 3-bedrooms (the "Property").

### The Policy

7. Malaga Towers first applied for coverage with QBE in June 2016. Upon information and belief, QBE performed a condition and value survey of the Property and found the property in good, insurable condition.

8. In exchange for a premium payment of $184,996, QBE issued to Malaga Towers a Commercial Lines Policy bearing policy number QFW6024-01, with policy period from July 1, 2017 to July 1, 2018 ("Policy"). A copy of the Policy is attached hereto as Exhibit A.

9. The Policy provides Malaga Towers $46,222,800 in coverage for the Property. The Policy's Hurricane Deductible is $920,196 per calendar year.

10. The Policy provides coverage for direct physical loss to the buildings at the Property:

**A. Coverage**

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> **1. Covered Property**
>
> Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.
>
>> 1. Building, meaning the building or structure described in the Declarations, including:
>>> a. Additions, alterations and repairs;
>>> b. Fixtures, outside of individual units, including outdoor fixtures;
>>> c. Permanently installed:
>>>> (1) Machinery; and
>>>> (2) Equipment;
>>> d. Personal property owned by you that is used to maintain or service the building or structure or its premises, including:
>>>> (1) Fire extinguishing equipment;
>>>> (2) Outdoor furniture;
>>>> (3) Floor coverings; and
>>>> (4) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering that are not contained within individual units;
>>> e. If not covered by other insurance, materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure;
>>> f. Air conditioning and heating equipment, including air conditioning compressors, used to service any part of the building or structure, including individual units and the limited common elements;
>>> g. Any other portion of the condominium property located outside of individual units, including improvements, additions and alterations; h. Fixtures, improvements, additions and alterations that are a part of the building or structure and contained within the boundaries of an individual unit, regardless of ownership, if your Condominium Association Agreement requires you to insure such property; and
>>> i. Additional property as described in the Schedule or in the Declarations.

Exhibit A, Condominium Association Coverage Form, Florida Changes – Residential Condominium Associations.

11. Hurricanes are a covered cause of loss under the Policy. See Exhibit A, Causes of Loss – Special Form. Accordingly, the cost to repair or replace property damaged by Hurricane Irma is covered under the Policy.

3

{00247912;v1}

12. The Policy's Loss Payment provision provides, in relevant part:

> **4. Loss Payment**
> a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>    (1) Pay the value of lost or damaged property;
>    (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;
>    (3) Take all or any part of the property at an agreed or appraised value; or
>    (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

Exhibit A, Condominium Association Coverage Form.

13. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of the Policy's Coverage Form. Accordingly, the cost to replace damaged property with new property of comparable material and quality is covered. Exhibit A, Condominium Association Coverage Form.

14. The Policy contains an Ordinance or Law Coverage Endorsement, providing $1,000,000 in coverage for, among other things, the increased cost of construction when the increased cost to repair is a consequence of the enforcement of the minimum requirements of ordinance or law. Exhibit A, Ordinance or Law Coverage Endorsement.

15. The Policy also imposes on the insured certain Duties After Loss, including a requirement that the Insured take all reasonable steps to protect the Covered Property from further damage. Costs incurred in an effort to protect against further damage are covered by the Policy.

16. Pursuant to the Policy, when there is a disagreement on the value of the property or the amount of the loss, either party may invoke appraisal:

**Mediation Or Appraisal**

If we and you:

B. Disagree on the value of the property or the amount of loss, either may request an appraisal of the loss, in writing. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and
2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

However, you are not required to submit to, or participate in, any appraisal of the loss as a precondition to action against us for failure to pay the loss, if we:

1. Requested mediation and either party rejected the mediation result; or
2. Failed to notify you of your right to participate in the mediation program.

Exhibit A, Florida Changes – Mediation or Appraisal (Commercial Residential Property).

<u>Hurricane Irma</u>

17. On September 10, 2017, Hurricane Irma struck Hallandale Beach with sustained winds of 78.14 miles per hour and gusts of 115 miles per hour. Malaga Towers is situated on Hallandale Beach next to the Atlantic Ocean, and thus, was exposed to the full force of hurricane winds.

18. Malaga Towers sustained significant damage as a result of Irma, including damage to roofs, balconies, windows/doors, and exterior walls. In addition, the building envelope was breached, allowing rainwater to penetrate into and damage the interiors. Interior damages include drywall, finishes in common areas, and the fire alarm.

The Claim

19. Malaga Towers promptly filed a claim with QBE. QBE assigned claim number 17P01098i-01 to this claim ("Claim").

20. QBE inspected the Property and acknowledged damage caused by Hurricane Irma, but refused to acknowledge the full extent of the damage.

21. Accordingly, Malaga Towers hired a public adjuster, Dan Odess of GlobalPro Recovery ("GlobalPro"), to assist it in quantifying and presenting the claim.

22. GlobalPro retained Falcon Engineering ("Falcon") to determine the cause and extent of damage to the Property. Falcon performed an engineering investigation and assessment of the Property, inclusive of onsite inspections, exterior drone inspections, interviews with building staff and residents, and review of relevant documents and weather data.

23. Falcon issued a report on May 8, 2018, recommending replacement of stucco, failed soffits, balcony railings, exterior sealants, damaged roof areas, and windows/doors.

24. GlobalPro retained DLT Building and Development Advisors ("DLT"), to estimate the cost to repair hurricane damages. DLT conducted onsite inspections, reviewed relevant documents, photographs and videos, and analyzed information gathered from a variety of sources. During onsite inspections, DLT observed separations of roof waterproofing membrane, sliding glass door systems, displacement of windows, and impact to exterior stucco allowing water intrusion.

25. DLT's estimate, which excludes hurricane mitigation expenses and fire alarm replacement, totals over $14 million. Malaga Towers provided QBE with a copy of DLT's estimate.

26. Red Hawk Fire and Security ("Red Hawk") inspected the fire alarm system and attempted to repair and service it for months following the Hurricane, but ultimately concluded it could not be done. The fire alarm system failed entirely. Red Hawk determined that the fire alarm system failed and required replacement as a result of Hurricane Irma.

27. Malaga Towers entered into a contract with Red Hawk to replace the fire alarm system at a cost of $631,875. Malaga Towers provided a copy of the contract and Red Hawk's findings to QBE.

28. Malaga Towers informed QBE of Falcon and Red Hawk's findings and provided QBE with copies of their reports.

29. Further, Malaga Towers informed QBE that the Property continued to suffer water intrusion damages since Hurricane Irma and that absent funds to perform permanent repairs, it would be necessary to incur substantial expenses to perform temporary repairs to protect the Property against further damage.

30. Malaga Towers provided QBE with an estimate from Restore Construction totaling approximately $2 million for temporary repairs, which included applying temporary waterproofing measures to the exterior of both towers.

31. Malaga Towers requested a modest advance of $4 million towards needed repairs.

32. QBE did not object to the Restore estimate or scope, but rejected Malaga's request for an advance, taking the position that the damages attributable to Hurricane Irma were below the deductible.

33. Accordingly, Malaga Towers was left with no choice save to obtain a loan and assess unit owners to fund temporary repairs to protect against continued water intrusion damage

{00247912;v1}

until such time as permanent repairs could be completed. Malaga Towers has thus suffered consequential damages as a result of QBE's refusal to pay for covered damages.

34. Though QBE refused to pay an advance on grounds that the damages were below the deductible, it continued to demand documents, inspections, and examinations under oath.

35. In response, Malaga Towers allowed QBE to perform an extensive on-site document inspection on March 29, 2018, April 13, 2018, April 16, 2018, April 18, 2018 and May 1, 2018. During these inspections, Malaga Towers produced from its archives in excess of twenty bankers boxes of documents dating back over fifteen years. Malaga Towers supplemented that production with documents obtained or generated subsequent to QBE's document inspection.

36. Malaga Towers timely provided QBE with a Sworn Statement in Proof of Loss ("POL") and supporting documentation. As additional information was gathered throughout the claim and additional expenses were incurred, Malaga Towers presented amended POLs with additional supporting documentation.

37. Malaga Towers also allowed QBE unfettered access to inspect the property both before and after the POL was submitted. QBE and its experts/engineers conducted inspections of the property over at least 24 days, inspecting every aspect of the property damage.

38. In response to QBE's demand for an Examination Under Oath (EUO) on numerous topics, Malaga Towers presented two witnesses who underwent extensive questioning for a total of approximately 15 and a half hours.

39. Malaga Towers fully complied with all the Policy's post-loss conditions.

40. Malaga Towers thereafter demanded Appraisal pursuant to the Policy in an effort resolve its dispute with QBE concerning the scope of loss.

41. QBE refused to go to appraisal and instead denied the claim altogether in breach of the Policy.

42. All conditions precedent to the filing of this lawsuit have occurred, been satisfied, or been waived.

43. Malaga Towers has engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable fee for services rendered.

## COUNT I – BREACH OF CONTRACT

44. Malaga Towers re-alleges Paragraphs 1-43 as though fully set forth herein.

45. In exchange for a premium payment of $184,996, QBE entered into an insurance contract with Malaga Towers, pursuant to which QBE agreed to pay up to $46,222,800 for loss and damage to the Property resulting from a hurricane.

46. While the Policy was in effect, the Property was struck by Hurricane Irma and suffered extensive damage as a result.

47. Malaga Towers submitted a claim to QBE, requesting it pay for covered losses under the Policy.

48. Further, Malaga Towers requested the amount of loss be determined pursuant to the Policy's Appraisal provision.

49. Despite having acknowledged the existence of covered damages, QBE refused to comply with the Policy's Appraisal provision and denied coverage for the loss. In doing so, QBE breached the Policy.

50. As a result of QBE's breach, Malaga Towers has suffered significant damages.

**WHEREFORE**, Malaga Towers respectfully prays this Court enter an order awarding Malaga Towers compensatory damages, consequential damages, attorneys' fees and costs

including any fees owed under Fla. Stat. § 627.428, pre- and post-judgment interest, and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Malaga Towers demands a trial by jury on all issues so triable.

Dated: July 24, 2019.

        Respectfully submitted,

        WEISBROD MATTEIS & COPLEY
        110 E. Broward Blvd., 17th Floor
        Fort Lauderdale, FL 33301
        Tel:  (954) 947-8607

        */s/ Meghan C. Moore*
        **Meghan C. Moore, Esq.**
        Florida Bar No. 668958
        mcmoore@wmclaw.com

        *Attorneys for Plaintiff*